**John B. McCORMICK, Ed Benesch, Bennie Jackson and Steve Pocztowski, Plaintiffs,**

v.

**Gerald ZERO and Local 705, International Brotherhood of Teamsters, Defendants.**

No. 00 C 2750.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 23, 2000.

Paul L. Strauss, Steven Arthur Mange, Miner Barnhill & Galland, Chicago, IL, Sarah E. Siskind, Mary Beyer, Miner Barnhill & Galland, Madison, WI, for Plaintiffs.

Peggy A. Hillman, Indianapolis, IN, Michael H. Slutsky, N. Elizabeth Reynolds, Allison, Slutsky & Kennedy P.C., Chicago, IL, for Gerald Zero.

Michael B. Erp, Irving M. Friedman, Harold A. Katz, Katz, Friedman, Schur & Eagle, Chicago, IL, Peggy A. Hillman, In-

dianapolis, IN, Michael H. Slutsky, N. Elizabeth Reynolds, Allison, Slutsky & Kennedy P.C., Chicago, IL, for Local 705.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

SHADUR, Senior District Judge.

This Court's conduct of a June 14 through 16 and June 22, 2000[1] preliminary injunction hearing in this action (the "Hearing") has been followed by the submission of proposed findings of fact and conclusions of law by counsel for the parties, followed in turn by each side's response to the other side's proposals. This Court has given full consideration to each party's submissions and to its own detailed Hearing notes (in aid of its own independent recollection), and what follows are this Court's findings of fact ("Findings") and conclusions of law ("Conclusions"). To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both of those respects, see *Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

*Parties and Issues*

1. Plaintiffs John McCormick ("McCormick"), Ed Benesch ("Benesch"), Bennie Jackson ("Jackson") and Steve Pocztowski ("Pocztowski") are four elected officers—respectively the President, Vice–President, Recording Secretary and a Trustee—of Local 705, International Brotherhood of Teamsters ("Local 705" or "Union") who bring this action pursuant to the provisions of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401 ("Act"[2]).

Together plaintiffs constitute a majority of Local 705's seven-member Executive Board.

2. It is plaintiffs' contention that Local 705's Secretary–Treasurer Gerald Zero ("Zero") has interfered with the performance of their duties as Local 705 officers, making it practically impossible to perform those duties, because plaintiffs have voiced opposition to and have voted against Zero's proposals, have filed internal union charges against Zero and are his political rivals expecting and expected to run against him in elections scheduled to be held in November 2000. Those things, plaintiffs assert, constitute illegal retaliation against them for their exercise of rights protected by the Act. Plaintiffs relatedly assert that Zero's actions have deprived Local 705 members of their right to representation by the officers they elected, will chill the exercise of free speech in Local 705's affairs and will deprive plaintiffs and other Local 705 members of the opportunity to run in free and fair elections for Union officer positions, scheduled to be held in November.

3. Zero contends that the actions he took against plaintiffs amounted to nothing more than the exercise of his right as Local 705's Secretary–Treasurer to terminate plaintiffs' positions as union business agents, with a corresponding decrease in their levels of compensation and a corresponding diminution in the Local 705 facilities made available to them.

4. Local 705 is a local union of the International Brotherhood of Teamsters, AFL–CIO ("the IBT" or "the International"). Although Local 705 is nominally a defendant in this action, both plaintiffs and Zero have taken the position that they are acting in its best interests. Because this Court viewed it as inappropriate for either side's counsel to represent Local 705, on

1. Because most (though not all) events referred to in these Findings and Conclusions took place this year, all dates listed without specifying a year designation are also 2000 dates.

2. Act citations will take the form "Act § —," referring to the section numbers in Title 29 rather than to the Act's internal numbering.

May 18 (see Finding 6) it ordered Zero's counsel to withdraw from such representation so that Local 705 could select independent counsel. Thereupon Local 705's Executive Board (of which Zero is also a member) unanimously selected the distinguished and experienced labor law firm of Katz, Friedman, Eagle, Eisenstein & Johnson to serve in that capacity.

### Procedural History

5. Plaintiffs filed their Complaint on May 5, followed quickly by a First Amended Complaint ("FAC") on May 10 and a Motion for Temporary Restraining Order and Preliminary Injunction, together with supporting affidavits and exhibits on May 15. Zero, represented by his counsel, promptly filed papers in opposition to that motion.

6. On May 18 both sides (this usage applies to the adversaries—plaintiffs and Zero—and not to Local 705) appeared before this Court, which issued a Temporary Restraining Order ("TRO"). In essence the TRO required defendants to give plaintiffs restored access to their offices and to the books and records of Local 705 and to resume paying plaintiffs their full salaries as they had existed before Zero's action that had purported to reduce those salaries. Then on June 1 this Court extended the TRO to give time for the parties to present evidence at a preliminary injunction hearing scheduled to be held on June 14 to June 16, the first dates available on this Court's schedule.

7. Before the scheduled Hearing, Zero and Local 705 filed their answers to the FAC on June 5 and June 7, respectively. Zero's deposition was taken on June 9.

8. As scheduled, the Hearing was held on June 14, 15 and 16. It was recessed at the parties' request at the end of the June 16 Hearing day so that they could discuss settlement. Because those talks were unsuccessful, the Hearing resumed and ended on June 22.

9. In addition to the witnesses who testified at the Hearing, the Zero deposition was admitted as evidence by mutual agreement (Zero having elected not to testify during the Hearing). All references to Zero's testimony are to his deposition.

### Provisions of the Act and the Parties' Positions

10. Because the facts developed during the Hearing must be viewed against the rights and duties conferred by the Act, a brief overview of those rights and duties (more fully addressed in the Conclusions) is in order at this point:

(a) Act § 411(a)(2) codifies the rights of free speech and assembly of every union member (including union officers).

(b) *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982) ("*Finnegan*") confirmed the right of the appropriate officers of unions to discharge union employees such as *appointed* business agents.

(c) *Sheet Metal Workers' Int'l Ass'n v. Lynn,* 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989) ("*Lynn*") confirmed, however, that it violated the Act to discharge an *elected* union official in retaliation for the exercise of free speech rights.

(d) Act § 411(a)(1) confirms the equal rights of all union members in connection with union elections and participation in union meetings.

11. To expand on Finding 2, these are plaintiffs' interrelated claims against Zero under the Act:

(a) Zero has interfered with the performance of their duties as officers for retaliatory reasons and because of their political opposition to him, interfering with plaintiffs' duty to represent Local 705 members and depriving those members of representation by the officers whom they elected.

(b) Zero's actions will make it impossible to hold free and fair elections because they will intimidate political oppo-

nents and will unfairly allow Zero to enjoy the advantages of incumbency, while improperly denying to plaintiffs the opportunity to serve and to communicate effectively with Local 705's members as incumbent union officers.

To expand on Finding 3, Zero argues in opposition that he has not interfered with or discharged plaintiffs from their positions as Local 705 officers. Instead, he says, plaintiffs hold separate positions as Local 705 employees, distinguishable from their positions as union officers, and that he has terminated plaintiffs only from their positions as employees. Although Zero admits that he did so because plaintiffs are political rivals and because they have voted and spoken in opposition to his proposals, he contends that he has a right to take such action with respect to Local 705 employees. In addition, Zero says, plaintiffs were performing poorly as employees and were removed from their employee positions for that reason.

12. Through its independent counsel, Local 705 has itself agreed with a material portion of plaintiffs' allegations. In particular Local 705's Answer ¶ 42 has admitted this FAC ¶ 42 allegation, bringing *Lynn* directly into play:

> Local union elections are scheduled to be held in November, 2000. Unless defendants are enjoined to restore plaintiffs' salaries and restore plaintiffs' access to the union offices, equipment, financial records, committee process, and staff, and hence to their elected positions, plaintiffs and their union-member supporters will be prejudiced in their ability as union members to run for office and support the candidates of their choice during these elections; plaintiffs, and union members generally, and in particular union members who voted for them, will also be chilled in the exercise of their own free speech rights.

*Background of the Present Controversy*

13. Local 705 is a Chicago-area local union of the IBT, representing approximately 18,000 members who work at United Parcel Service ("UPS"), at cartage and freight companies and at other companies. Local 705 is a party to about 500 different collective bargaining agreements. Its members participate in Joint Pension and Health and Welfare Funds (collectively "Funds"), and Local 705 appoints the labor members who serve as Trustees of those funds. At this time the Pension Fund holds over $1 billion in assets. In addition to their positions as Local 705 officers, McCormick and Benesch serve as Trustees of the Funds.

14. About 12,000 of the Local 705 members work for UPS. Local 705 has grown considerably in size over the past decade, due largely to growth in employment by UPS.

15. Local 705 has seven officers who constitute the Executive Board: all four plaintiffs, Zero and two additional Trustees. Before being elected to his position in Local 705, each plaintiff worked for more than 20 years as an employee of UPS, while Zero has had no experience working for UPS. Plaintiffs are the only Local 705 officers who have ever worked at UPS.

16. For many years in the past, plaintiffs and Zero cooperated in a reform movement within the IBT, supporting Ron Carey ("Carey") in his election as IBT's General President and opposing James P. Hoffa ("Hoffa"), who ran against Carey and has since become (and is now) IBT's General President.

17. In the early 1980s the IBT placed Local 705 into trusteeship, with Zero and McCormick being employed by IBT to act as assistants to Trustee Harold Burke ("Burke"). During that time McCormick was responsible for managing all aspects of Local 705's representation of members who worked at UPS. When during the trusteeship Zero was named to replace Burke as Trustee, McCormick continued to be employed by the IBT and continued

to manage the representation of Local 705 members who worked at UPS.

18. In 1995 Local 705 was removed from trusteeship and officer elections were held. Plaintiffs (including Pocztowski, who ran to become an elected Business Agent) and Zero ran on a slate together and were elected.

19. After the 1995 election plaintiffs were responsible for the representation of Local 705 members who worked at UPS. McCormick was involved in all aspects of the relationship with UPS, including contract negotiations, arbitrations and supervision of business agents who served members employed by UPS. Benesch, Jackson and Pocztowski divided up major UPS facilities between them and provided Local 705's services to members who worked for UPS: training stewards, processing grievances, talking to members about their employment problems, informing members about Local 705's programs and representing members in hearings before a monthly joint UPS–Union grievance panel.

20. In 1997 plaintiffs (this time with Pocztowski running to be a Local 705 Trustee rather than an elected Business Agent) and Zero ran again for another three-year term, and all were elected. After that second election the Local 705 management continued to be organized in the same fashion, with McCormick in charge of the representation of members who worked at UPS and with the other three plaintiffs working with him on UPS matters. That arrangement was a cooperative one rather than a strictly hierarchical arrangement. McCormick and the other plaintiffs concentrated on representing Local 705 members who worked at UPS, while Zero concentrated on those working for cartage and freight companies.

21. It would have been possible in theory for plaintiffs' work for Local 705 to be limited to performing only the duties required of them by the Local 705 Constitution and Bylaws ("Bylaws" [3]), as set out in the following Findings. But the conduct of the parties reflects their mutual agreement that Local 705 members would be best served by having plaintiffs work full-time, concentrating on the representation of members who work at UPS—as stated earlier, they constitute the substantial majority of all Local 705 members.

### Local 705's Bylaws

22. Under Bylaws § 14 the Executive Board of Local 705 has overarching responsibility for managing the Union's operations. In relevant part Bylaws § 14 provides:

(A) Except as may be otherwise provided in these Bylaws, the Local Union Executive Board is authorized and empowered to conduct and manage the affairs of this organization, and to manage, invest, expend, contribute, use, borrow, lend and acquire Local Union funds and property in the pursuit of accomplishment of the objectives set forth in the Constitution of the International Union and these Bylaws and resolutions adopted in furtherance thereof .... The Local Union Executive Board, in addition to such other general powers conferred by these Bylaws, is hereby empowered to:

\* \* \* \* \* \*

(2) Provide the salaries for the officers and elected Business Agents and provide the allowances, direct and indirect disbursements, expenses and reimbursement of expenses for officers and elected Business Agents...;

(3) Loan and borrow monies directly and indirectly for such purposes and with such security, if any, as it deems appropriate...;

3. "Bylaws" is used here as a shorthand description both (1) because the internal references in that document, despite its lengthier title, simply employ the "Bylaws" term (see, e.g., Bylaws § 24) and (2) to avoid confusion with any references to the IBT Constitution (cited here "Const. Art.— § —").

(4) On behalf of the Local Union, its officers, employees or members, initiate, defend, compromise, settle, arbitrate or release or pay the expenses and costs of any legal proceedings or actions of any nature if, in its judgment, it shall be necessary or desirable to protect, preserve, or advance the interests of the organization;

(5) Transact all business and manage and direct the affairs of the Local Union between membership meetings except as may otherwise be herein provided; delegate when necessary any of the above powers to any officer for specific and temporary purposes and on condition that the action of such officer or agent be ratified by the Local Union Executive Board . . . ;

(6) Lease, purchase or otherwise acquire in any lawful manner for and on behalf of the organization, any and all real estate or other property, rights and privileges, whatsoever deemed necessary for the prosecution of its affairs, and which the organization is authorized to acquire, at such price or consideration and generally on such terms and conditions as it thinks fit, and at its discretion pay therefor either wholly or partly in money or otherwise;

(7) Sell or dispose of any real or personal estate, property, rights or privileges belonging to the organization whenever in its opinion the Local Union's interests would thereby be promoted;

\*   \*   \*   \*   \*   \*

(10) Appoint trustees of Health and Welfare or Pension Trust Funds negotiated directly by the Local Union;

\*   \*   \*   \*   \*   \*

(12) Do all acts not expressly authorized herein which are necessary or proper in implementation of the above duties for the protection of the property of the Local Union and for the benefit of the organization and members . . . .

23. In addition to the duties imposed on Local 705's officers as members of the Executive Board, the Bylaws assign specific duties to each of the officers:

(a) Bylaws § 8(A) provides that the Secretary–Treasurer of the Union (the position now held by Zero) shall be Local 705's principal executive officer and, as such:

He shall appoint all committees, in general, supervise, conduct, and control all of the business and affairs of the Local Union, its officers and employees. He shall have charge and supervision of all the officers and employees of the Local Union including elected Business Agents. He shall have the power to appoint, suspend, or discharge all appointive organizers, appointive Business Agents, Assistant Business Agents, and employees and to set their salaries. The principal executive officer shall also have charge of all labor controversies involving the Local Union.

(b) Bylaws §§ 8(B) and (C) provide that the Secretary–Treasurer in conjunction with the President shall sign all official documents such as deeds, mortgages and contracts and shall have the authority to disburse money necessary to pay bills.

24. Bylaws § 7 describes the duties of the President (the position now held by McCormick), with Bylaws § 7(A) providing:

(A) It shall be the duty of the President to preside at membership meetings of this Local Union and to preserve order therein. He shall also have the right to serve on all committees by virtue of his office, and in general, shall perform all duties incident to the office of President, and such other duties as may be assigned by the Local Union Executive Board, principal executive officer or membership from time to time.

As Finding 23(b) reflects, the President also has the duty with the Secretary–Treasurer to sign official documents and provide for payment of bills.

25. Bylaws § 9 describes the duties of the Vice President (the position now held by Benesch):

> It shall be the duty of the Vice President to preside at Local Union membership meetings in the absence of the President. He shall perform such other duties and render such assistance as may be directed by the principal executive officer or by the President.

26. Bylaws § 11 describes duties of the Recording Secretary (the position now held by Jackson), including these:

> It shall be the function of the Recording Secretary to attend general membership meetings of the Local Union and the Local Union Executive Board and to keep minutes of the proceedings. He shall keep a record of the names of the members comprising each committee.... Minutes of division or craft meetings shall be read and approved at the next following meeting of the division or craft involved.

27. Bylaws § 12 describes the duties of Local 705 Trustees (such as Pocztowski), including these:

> It shall be the duty of the Trustees to conduct or have conducted a quarterly examination of the books of the Local Union and the results thereof shall be reported at the next regular membership meeting. They shall sign the books of the Secretary–Treasurer only if they find no irregularity....

28. In addition to the previously described duties as members of the Executive Board and as individual officers, Bylaws § 15(E) provides that plaintiffs and all other officers are fiduciaries for the members of Local 705, holding positions of trust and required to account and explain for use of its funds and property.

### Changes in Officers' Duties and Compensation

29. Although Zero as Local 705's principal executive officer has the power to discharge or suspend its *appointed* employees, he may not discharge or affect the basic duties of Local 705's other elected *officers*. Const. Art. XXII, § 3(d) provides:

> During the term of office of any officer of a Local Union or other subordinate body, no action under any circumstances may be taken to affect or modify the basic powers and duties of the incumbent officer, as established by the Bylaws or past practice. During the term of office of any officer or elected Business Agent of a Local Union or subordinate body, his salary may not be reduced an unreasonable amount as a subterfuge to force his resignation. Any reduction in salary during a term of an elected officer in a Local Union or subordinate body shall be made only on the basis of adverse change in financial condition as attested to by the General Secretary–Treasurer of the International Union.
>
> Any modification of the basic duties and powers of an office, and any reduction in salary of an officer, except as provided above, may be made effective only as of the beginning of the next term of office.

Local 705's Bylaws § 24 naturally makes all of the Bylaws subject to the International Constitution. As for plaintiffs' present terms of office, they will expire at the end of December 2000, after the elections held in November.

30. As Finding 22 reflects, under Bylaws § 14(A)(2) Local 705's officers' salaries are set by its Executive Board, not by Zero. In accordance with that authority, the salaries for Local 705's officers were set at the end of 1994 when the Union emerged from trusteeship and were described in a letter written at the time by Zero (P.Ex. 21) as $85,000 for the Secretary–Treasurer, $80,000 for the President, $70,000 for the Vice President and for the

Recording Secretary and $63,000 for each Trustee. Minutes of the Local 705 Executive Board show that it approved salary increases for the officers in March 1996 and again in March 1999. LM–2 forms filed by Local 705 with the federal Department of Labor (P.Ex. 20 at 7) show that in 1999 almost $97,000 was paid to Zero as Secretary–Treasurer, about $94,350 to McCormick as President, over $87,000 to Benesch as Vice President, about $86,000 to Jackson as Recording Secretary and over $76,000 to Pocztowski as a Trustee.

### Background Leading to the Current Dispute

31. Following the 1997 election in which plaintiffs and Zero ran and then thereafter continued to act as a team in managing Local 705's affairs, in 1999 Zero was suspended from union membership and from his office as Secretary–Treasurer following his criminal conviction for assaulting a member at Local 705's offices. While Zero served his suspension from February 1, 1999 to February 1, 2000, McCormick served as Local 705's principal executive officer.

32. During the period of Zero's suspension (in the spring and fall of 1999), he broached to Jackson a proposal that they run together on a ticket (without either McCormick or Benesch to be on the ticket) in the Local 705 officer elections scheduled to be held in November 2000. Zero also suggested to Jackson that the latter might replace Benesch as a Trustee of the Funds. Zero told Jackson, who is African–American, that McCormick and Benesch are racists and that minority persons would never advance while they were in positions of power. Jackson did not agree to run with Zero, and he also told Zero that he was not interested in being a Trustee of the Funds and that Zero and McCormick should work out their differences.

33. At the January 14, 2000 meeting of the Local 705 Executive Board, plaintiffs discussed their intent to file internal union disciplinary charges against Zero if he returned from suspension to resume his position as Secretary–Treasurer. Those potential charges were discussed at the January 14 meeting (see its minutes, P.Ex. 9 at 4, for a summary of those discussions), held a few days before the January general membership meeting.

34. At the end of January McCormick and Zero discussed their differences and tried to settle them. They reached a tentative agreement that, among other things, called for no retaliatory firing of Local 705 employees when Zero returned from his suspension. Despite that, Zero began to fire Local 705 employees within the first week after he returned from suspension. On February 8 (just after Zero had returned from his suspension) all four plaintiffs filed internal Union disciplinary charges against Zero, alleging that he had engaged in misconduct during the year of his suspension just before leaving on suspension (P.Ex. 22).

35. At least from that point forward (if not indeed before that), Zero treated plaintiffs as political opponents. He undertook a series of harassing and petty actions that were designed to demean the plaintiffs, to cut off their contacts with Local 705's members and to make it impractical or impossible for them to carry out their duties as Local 705 officers. Ensuing Findings detail those improper actions.

### Zero's Improper Actions Against Plaintiffs

36. Each of McCormick, Benesch and Jackson had an individual office at Local 705's headquarters, with doors that could be locked, while Pocztowski worked from a cubicle. Plaintiffs kept extensive files and records in their offices, including copies of contracts, grievances, arbitrations, minutes of Executive Board and general membership meetings, notes of contacts with members, notes of contacts with officers at other unions and documents related to the Funds. Plaintiffs cannot reasonably be

expected to perform their duties as Local 705 officers properly without maintaining personal files and records, to which they can of course have continuous access without having to ask Zero for permission.

37. In February Jackson reported that files and personal items were being taken from his office. Although Zero promised to have the locks changed, he did not do so. Then on March 16, when Jackson returned to the Local 705 office after a doctor's appointment earlier that day, he found papers and files from his office piled in stacks on the floor outside his office, with the office door being blocked by three Local 705 employees who told Jackson to see Zero. When Jackson went to talk to Zero, the latter said that he (Zero) was Local 705's principal officer, that he was converting Jackson's office to be used for Union organizers and that he had a right to do so. Jackson returned to the hallway and sorted through the piles of papers and files there into the evening, trying to determine whether the files were all there. Jackson finally concluded that a number of his files, some cash he had left in a desk drawer and his computer and computer disks were missing. When Jackson tried the door to his office, he found that it was locked and that his key no longer worked—the lock had been changed. Both the missing files and the missing computer records were particularly valuable in that they contained the names and contact information for Local 705 members who might be resources in a Union election.

38. Jackson went home and called McCormick, asking him to come into the office the next day so he could act as a witness when Jackson confronted Zero. On the morning of March 17 Jackson went with McCormick to talk to Zero. One of Local 705's in-house attorneys, Michael Holland ("Holland"), was present at the time. Jackson told Zero that he wanted to look inside his office to see if the missing files and computer were there, but Zero said he was too busy. Jackson said that

he needed to see if the materials were in the office and that if Zero didn't open up the office he would have to call the Chicago police. Zero responded by saying that if the police were called he would tell them (falsely) that Jackson had taken $100 from his desk.

39. Jackson did call the police, and a number of officers came. After Jackson explained the situation, the police officers asked Zero to open the office. He said he couldn't because he didn't have the key. When they again asked him to open the office, he repeated that he didn't have the key. When the officers made a third request, Zero responded by pointing to a ring of keys and saying that the office key might be on that ring. One of the Local 705 employees then took the ring of keys, went to Jackson's office and used one of the keys to open the door, revealing an empty office.

40. As a result of the just-described events Jackson instituted several types of charges against Zero: a criminal charge, internal Union disciplinary charges and a complaint with the Illinois Department of Human Rights (P. Exs.28–30).

41. Zero also took a series of actions that are intended to undercut plaintiffs' involvements with the Local 705 membership employed at UPS (as already described, that constitutes the area of plaintiffs' principal responsibility—by far—as Local 705 officers). This Finding sets out Zero's major initial efforts in that respect:

(a) At the January general membership meeting, Zero proposed amendments to the Bylaws that would cut plaintiffs out of the structure of representing the Local 705 members who worked at UPS. More specifically, the proposed Bylaws amendments called for creation of a Stewards' Council that would report to Zero, bypassing any reporting relationship with the plaintiffs. Plaintiffs opposed that proposal, which was eventually defeated by a vote of the membership at the March meeting. Zero has admitted that plaintiffs' opposi-

tion to his plan was one of the reasons that he took his actions against them (Zero Dep. 15–17).

(b) While Zero had been on suspension, members of Local 705 led by McCormick were involved in an arbitration and a series of negotiations with UPS to try to settle the number of full-time jobs that were owed to Union members after settlement of a 1997 strike against UPS. Significant issues included the number of full-time jobs that UPS was required to create, whether reciprocity would be provided between the UPS pension plan for part-time employees and the Local 705 Pension Plan and whether UPS was satisfying its obligations to provide full-time jobs when it created so-called "combo jobs": the combination of two part-time jobs in a fashion that would provide full-time jobs only by the displacement of part-time employees.

(c) Although both McCormick and Jackson were key figures in those negotiations, were familiar with the history of the negotiations and had extensive experience in dealing with UPS, McCormick heard reports in early 2000 that Zero was meeting with UPS representatives—without McCormick and Jackson—to negotiate a settlement of the full-time jobs issues. Although at the February 18 Executive Board meeting Zero answered a question by saying that McCormick was still in charge of UPS (P.Ex. 10 at 3), Zero then proceeded to report to the Local 705 membership that he had reached an agreement with UPS to resolve the full-time jobs issue without any participation by plaintiffs. McCormick and the other plaintiffs understand that Zero agreed to a settlement that provided less to the Local 705 membership than UPS had promised to McCormick in their last negotiating sessions at the end of January: At the end of January UPS had agreed that it would provide 325 full-time jobs, while Zero reported that he negotiated a settlement that provided for only 275 such jobs. In the April 14 meeting of the Executive Board McCormick and the other plaintiffs expressed opposition to the UPS agreement that Zero had negotiated and said it was inferior to what UPS had previously offered (see P.Ex. 11(a) at 6).

(d) In still another move against plaintiffs in the performance of their activities as Local 705's officers responsible for managing the functions related to UPS' operations, in February Zero ordered that Benesch be replaced by Local 705 employee Tom Nightwine ("Nightwine")[4] as Chairman of the UPS grievance panel (the joint UPS–Union body that hears grievances and tries to resolve them short of arbitration).

(e) In still another such move, in February Zero attended a stewards' meeting. There he emphasized to the stewards that they owed their appointments as stewards to him.

42. Zero and plaintiffs had a series of other disagreements on policy issues at Executive Board meetings. For example:

(a) On January 14 the Executive Board voted to approve and to send to the members a resolution calling for a $5 monthly assessment to build up a strike fund. Then at the membership meeting the following Sunday, Zero proposed a Bylaws amendment calling for a $2 monthly assessment. Plaintiffs opposed Zero's proposal as insufficient.

(b) Zero has proposed hiring a series of part-time Local 705 business agents: employees who would work part of the day for UPS and part of the day as Local 705 representatives. Plaintiffs opposed that plan as inconsistent with Local 705's general position that workers deserve full-time jobs. Plaintiffs were

---

**4.** Nightwine is a contract administrator employed by Local 705. When Zero returned from his suspension, he made Nightwine chairman of the UPS grievance panel, replacing Benesch.

successful in proposing a resolution, passed at the March 17 Executive Board meeting, calling for Zero to employ only full-time Local 705 representatives (P.Ex. 11 at 6).

43. Still another issue between plaintiffs and Zero stems from Pocztowski's letter to the General Secretary Treasurer of the IBT, complaining that in his examination of the Local 705 records he had found that Zero had made an unauthorized $800 loan from the Union to one of its stewards, Jimmy Smith, in violation of the Bylaws. Pocztowski sent a copy of the letter to the Independent Review Board, a body set up to oversee the operation of the Teamsters as part of a consent decree negotiated by the federal government and the IBT to settle a RICO lawsuit. Zero was aware that an issue had been raised about that loan—he reported on it and gave an explanation at the April 14 Executive Board meeting (P.Ex. 11(a) at 6).

44. Another area of policy differences was exhibited in one of Local 705's general membership meetings in March or April, when Jackson stressed to members that financial reports showed that the Union was spending money far in excess of its budget. Although Local 705 had been run without a deficit for the first time in many years during the year that Zero was on suspension, upon his return it was running a deficit, particularly because of high spending on employees. Zero responded cavalierly that budgets are meant to be broken.

*Critical Events During April and May*

45. On Friday, April 14 the Executive Board convened in a meeting that brought to a head a number of disagreements between the parties. In the meeting Jackson said that the Board did not appreciate Zero's spending habits, that Zero could not use the members' money as his personal piggy bank and that the money that was being spent belonged to the members. As Finding 41(c) has said, plaintiffs made a record of their disapproval of Zero's nego-

tiations with UPS. They voted to reject Zero's proposal that Local 705 hold elections for its officer positions at the same time that elections would be held to select delegates to the IBT convention. They also voted to remove one of the Trustees of the Funds, Otis Cross, and to replace him with Greg Foster. As Zero recalls the meeting, plaintiffs continually raised the issue that he was spending too much and was wasting the members' money (Zero Dep. 38; P.Ex. 11(a) at 6).

46. Just three days later (on Monday, April 17) Zero delivered letters to each plaintiff telling him that he was discharged from the "appointive" position he held with Local 705. Zero directed plaintiffs to turn in their keys both to the individual offices used by McCormick and Benesch and to the outer doors of the Local 705 offices. Zero ordered them to turn in their parking passes, all Union equipment, files, books and record. In addition, Zero had Local 705 cut off the service to plaintiffs' telephone pagers and ordered Local 705 employees to cut plaintiffs' salaries to a stipend of approximately $15,000 per year. Within a week Zero sent plaintiffs another letter ordering them to remove all their personal belongings, intending that they vacate their offices (Zero Dep. 12–13). But at the same time, despite having deliberately destroyed their ability to do so effectively, Zero wrote that plaintiffs continued to be responsible to carry out their fiduciary duties as Union officers.

47. Zero designated Dan Campbell ("Campbell") as the Local 705 employee who would replace McCormick as the person in charge of members at UPS. Zero understood that Campbell went through plaintiffs' files and records (Zero Dep. 133). Then Zero had all of plaintiffs' records put into boxes and placed in a locked storage area in the basement of the building. Zero also had McCormick's office converted into a conference room, even though the Local 705 offices already had two conference rooms (Zero Dep. 173). Zero never explained why that was either

useful or necessary. It must be concluded that the just-described actions, like all of Zero's other actions described in earlier and later Findings, were vindictive and retaliatory for plaintiffs' exercise of their rights of free speech and free assembly in opposition to Zero's policies.

48. In much the same way, Benesch's office was emptied out, but no special use was made of it. As Zero testified, "We didn't do anything with his office. They just moved some UPS stuff in there...some boxes and junk" (Zero Dep. 174). Again Zero never explained why that was either necessary or useful.

49. At about the same time that he ordered plaintiffs to vacate their offices and turn in their keys, Zero sent an "Open Letter" to all Local 705 members (P.Ex. 3) telling them that he had fired plaintiffs on an emergency basis. Zero's letter was mailed on Union stationery, with printing and copying paid for by Local 705 (Zero Dep. 5). Among other things, Zero wrote in the letter:

> I removed four Local Union officers [McCormick, Benesch, Jackson, and Pocztowski] from their positions as Union Representatives after it became clear that they are opposed to our Local Union policies designed to protect and advance the lives of our members and to do the work that they were being paid to do.

Zero wrote that plaintiffs' "failure to support [his] programs and policies are anti-member and pro-employer and cannot be tolerated." Zero described plaintiffs as "the Gang of Four" and said they "have attempted to further their own personal and political agendas at the expense of the established policies that the members demanded in order to protect the interests of all Local 705 Teamsters." Zero accused them of "adopting the rhetoric of management against our hard won full time jobs at UPS" and wrote that "it became clear that they would stop at nothing, including siding with employers, to try to grab pow-er that they couldn't possibly earn legitimately at the ballot box." Zero added:

> Among their most disgraceful acts was arriving unprepared at grievance hearings, telling members not to file grievances, and dumping their grievances on other staff members moments before Grievance Panel hearings.

\*     \*     \*     \*     \*     \*

> For these and other reasons itemized in this letter, I felt I had to remove these four gentlemen from their positions as Union Representatives in order to protect the integrity and strength of Local 705. Although they must remain elected offices throughout their term ending this fall, they can no longer be allowed to draw their substantial salaries while working against the good of the members.

50. At the same time that Zero's letter to all Local 705 members leveled those sharp attacks on plaintiffs, it said that McCormick, Benesch, Jackson and Pocztowski would continue to serve as Union officers. It further illustrates the level of Zero's hypocrisy that he did not disclose the arbitrary steps that he had taken and would take to frustrate their ability to do so, nor did he offer any explanation as to how Local 705 members could communicate with plaintiffs. No phone number or office was listed where they could be located.

51. Understandably, when Union member Joan Richardson tried to reach Pocztowski by calling the Local 705 headquarters at the end of April, she was told "he doesn't work here any more." Zero likewise told UPS management that plaintiffs were "terminated" and were no longer acting as representatives of members who work at UPS (Zero Dep. 74). Similarly, Zero told Tony Judge, the head of Teamsters Joint Council 25 (an organization of Chicago-area Teamsters unions) that plaintiffs had been "terminated" (Zero Dep. 115).

52. On May 5 Jackson asked to be admitted to the offices of Local 705 so that he could check his mail, but he was denied admission (Ex. 2 to plaintiffs' TRO motion ¶ 16). Then on May 10 McCormick and Jackson were told by UPS security officers at the UPS facility in Bedford Park, Illinois that they were not allowed to be on UPS property. This Court finds that all reasonable inferences call for the conclusion that such a restriction imposed by UPS also followed directly from Zero's communication to UPS saying that plaintiffs were "terminated."

53. Local 705 publishes a monthly newsletter (the "Teamsters Local 705 Update") describing its activities. Until Zero's April 2000 freezeout of plaintiffs described in earlier Findings, the newsletter typically featured activities of the officers, including a column about UPS written by McCormick. But in May the newsletter (P.Ex. 4) was published with no mention of plaintiffs at all. Instead a large portion of the newsletter was devoted to a planned reorganization of coverage at UPS, involving stewards' councils that would report up to Zero without any involvement by any of the other officers. That newsletter was written as if plaintiffs did not exist.

54. As Finding 22 reflects, Bylaws § 14(A)(2) provides that Local 705's Executive Board sets the salaries of the Local's officers. At the May Executive Board meeting the Executive Board voted 4 to 3 to restore plaintiffs' salaries. Despite that vote, Zero arbitrarily refused to order the restoration of plaintiffs' salaries. Hence until the Hearing Zero's violation of the Bylaws barred plaintiffs' receipt of more than the reduced $15,000 annual salaries imposed by Zero's unilateral action.

55. On May 18, after having reviewed materials submitted by plaintiffs and Zero, this Court issued a temporary restraining order ("TRO") ordering Zero, Local 705 and their respective employees and agents:

(a) to resume paying to each of the four plaintiffs the full salary that he was being paid as of April 1;

(b) to provide plaintiffs with full access, without interference, to the books and records and to the bookkeepers and other members of the staff, of Local 705;

(c) to give plaintiffs the same full access that they had as of April 1, again without interference, (1) to their offices, (2) to the Local 705 phone system, phone mail system and pagers and (3) to all other equipment and facilities that plaintiffs had used in the past at Local 705; and

(d) to direct all employers subject to collective bargaining agreements with Local 705 to provide plaintiffs with the same access to their facilities and employees that plaintiffs had as of April 1.

Zero was fully informed about the terms of that TRO by his attorney, Ms. Peggy Hillman, on the afternoon of May 18. But despite being so informed, Zero did not take reasonable action to return plaintiffs to their offices or to return plaintiffs' books and records to them. As the following Findings reflect, exactly the opposite is true.[5]

56. Plaintiffs did not go to the Union offices on May 18 or 19 (a Friday). As described by McCormick, plaintiffs wanted to give time to Local 705's staff to absorb the terms of the TRO and put their offices back in order, and they wanted to avoid any kind of altercation, while feelings were high, before the general membership meeting scheduled for May 21 (a Sunday).

57. On Monday May 22 plaintiffs went to the offices of Local 705. They were met there by Jeff Burke ("Burke," another in-house lawyer for Local 705), who gave them keys to the outer doors of the offices but told them they were not going to be

---

5. One thing that is not addressed in these Findings and Conclusions is the appropriate judicial response to such scofflaw flouting of an express court order by Zero. That is an issue that counsel should be prepared to address at the next status hearing.

returned to their own offices. Instead he told them they should find some place to sit. McCormick and the other plaintiffs said that was not sufficient and was not in compliance with this Court's TRO. Burke went off to talk to Zero and came back, saying that plaintiffs were not going to be returned to their offices and that if they wanted to talk to Zero they could wait—he was in a meeting. Plaintiffs did not elect to wait, but rather left and spoke with their attorney, who in turn communicated with Zero's counsel.

58. Plaintiffs thereafter came back to the Local 705 offices each day of that week: on Tuesday, Wednesday, Thursday and Friday, May 23 through 26. On each of those days they were given access to their offices, but their books and records were not restored. McCormick's office contained only a conference table and chairs, rather than his desk and files. Each day plaintiffs were told by Local 705 employee Mark Postilion ("Postilion") that their files had not been moved back because a janitor named Van Barnes ("Barnes") had the key and he was sick. Yet McCormick saw Barnes at the offices on Thursday, May 25. Accordingly plaintiffs filed a motion for an order to show cause why Zero should not be held in contempt on that afternoon. Zero's lawyers responded with a declaration saying that Barnes had indeed been at the office on Thursday, but that he was too busy to move plaintiffs' files because he was setting up chairs for an Irish–American dinner.

59. Zero testified in his deposition that he took virtually no action to restore plaintiffs' records to them until he was threatened with the motion for contempt. Although the TRO was issued on Thursday May 18 and Zero knew it, he didn't do anything on Thursday or Friday to get the files returned to plaintiffs. All he knew, he claimed, was that plaintiffs' files were in the basement somewhere, stored away by Barnes. Zero went on to testify that his secretary called Barnes but did not get any useful information to be passed on to Zero (Zero Dep. 121–22):

Q. Did she ask where the key was?

A. I have no idea.

Q. Did you ask her to go get the key?

A. No.

Q. Why not?

A. I don't know.

Q. Now, did you ask building management to let you in to where the files were?

A. I don't know where they were.

Q. Did you call to find out where they were?

A. Call?

Q. Mr. Barnes?

A. I don't know what her conversation was with Mr. Barnes.

Q. Did you do anything else to try to get those files up to their offices?

A. I don't think so.

Zero could not recall if he did anything else to restore plaintiffs' files until plaintiffs filed a motion for leave to show cause why Zero should not be held in contempt.

60. There is only one reasonable explanation for Zero's actions—the simplest one. This Court finds that Zero intended to keep plaintiffs out of Local 705 and its offices, frustrating their attempts to review Union records and to be involved in Union affairs, as much as he could. And he carried out that intention by deliberately flouting this Court's TRO, hoping to insulate himself from accountability by playing ostrich and by utilizing the efforts of his counsel to avoid responsibility.

61. After the TRO was entered, Jackson asked Local 705's bookkeeper Ron Demerjian for a list of the Union's employees and their salaries. Despite the provision of the TRO that had ordered Zero to give plaintiffs full access, without interference, to the books and records of Local 705, Jackson was instead sent a memo from Zero, bearing his initials and the date 5/15/00, saying that any such requests had

to be submitted in writing. Even apart from the fact that such a limitation was inconsistent with the TRO's absolute obligation, Zero admits that he knows of no provision of the Bylaws that would authorize him to impose that kind of restraint (Zero Dep. 118–19).

62. Another Local 705 membership meeting was held on Sunday, May 21 (three days after entry of the TRO). At that meeting Jackson again raised the issue of too much money being spent on employee salaries, money outside of the budget. Zero responded by saying to the membership, "These guys can stick the budget up their ass." Then, when the meeting turned to the regularly-held open microphone session in which members are allowed to address any topic, a number of members lined up to talk about UPS-related issues. Zero said they should not talk about UPS because he had scheduled a separate meeting to talk about UPS. Union steward Harry Stewart ("Stewart"), who works at UPS, approached the microphone. Before he could begin to talk, Zero said, "What are you, stupid? I told you we are going to hold discussion about UPS until after the meeting." Under the Bylaws the Local 705 President (McCormick) is in charge of keeping order at membership meetings. When McCormick properly interceded, telling Zero he had no right to direct Stewart not to talk, Zero responded by ordering custodian Barnes to cut off both the microphones on the floor and McCormick's microphone. Unable to make himself heard, McCormick was compelled to adjourn the meeting.

### Zero's Retaliatory Actions Against Others

63. Plaintiffs also presented testimony from Local 705 employees Jon Clary ("Clary") and William Blake ("Blake") that Zero is taking action against members of the Union who fail to pledge political support to him. That evidence, set out in Findings 64 through 73, is credited by this Court.

64. Clary is a former UPS employee who worked as a Union representative for Local 705 starting in September 1999 until he was fired by Zero on March 20, 2000. Three days before that firing Nightwine asked to talk to Clary. Nightwine told Clary that Zero thought he was doing a great job and should keep up the good work. Nightwine asked if Clary was going to support Zero in the upcoming elections, saying, "You got to realize that Ed, John, Steve and Bennie won't be here forever. I understand your loyalty to Ed and John, but Jerry's in charge now." Nightwine also promised Clary that if he would support Zero, he (Clary) would be given responsibility for covering the UPS facilities being covered by Benesch. Clary replied that he would think about it over the weekend.

65. On the same day Union representative Postilion also talked to Clary. Postilion said that Clary was doing a great job as a Union representative and that Zero wanted his support in the upcoming elections. Postilion said that Clary needed to tell Zero by the end of that day (March 17) whether Clary was going to support Zero. Clary neither talked to Zero that day nor promised anyone that he would support Zero.

66. Two days later (on March 19) Clary attended a general membership meeting, during which the membership voted on Zero's proposed Bylaws amendment to create a stewards' council. Clary voted against all of Zero's proposals to change the Bylaws.

67. On the very next day (March 20) Clary received a letter from Zero saying that he was fired as a Union representative. There were no criticisms of Clary's performance—only a statement that "I have determined that I will not entrust you to carry out union policy in the future...." Before that firing Clary had received no criticism from anyone about his performance.

68. Blake worked as a Union representative for Local 705 from 1996 until he too was fired by Zero this year (in April). Blake is also a Trustee of the Funds.

69. Like Clary, Blake received no criticism of his performance as a Union representative before he was fired. Blake testified (and this Court credits) that from the time Zero came back from his suspension in February until the time Blake was fired in April, Zero talked to Blake for only a few minutes.

70. In about December 1999 or January 2000 Postilion asked Blake to support Zero. Postilion said to Blake:

> Gerry thinks you are a good guy. He wants you on his team. No one wants to be on an island by himself. It's best to get on the train or else get run over by it.

Blake told Postilion that he did not agree with what Zero was doing and that he didn't think McCormick was getting the proper respect.

71. Near the end of 1999 or at the beginning of 2000, Union employee Richard DeVries ("DeVries") asked Blake about giving up his position as a Trustee for the Funds. DeVries asked Blake to call Zero at home, but Blake did not do so.

72. In February 2000, a few weeks after DeVries had talked to Blake for a second time about giving up his Funds Trustee position, Union employee Otis Cross ("Cross") also asked Blake to give up that Trustee position. Cross told Blake, "We are holding that position for Gerry" and said, "If you do the right thing you will give it back to Gerry." Cross also said, "If you don't you might get some heat."

73. Blake did not give up his position as a Trustee for the Funds. In April he was fired from the Union representative position, though he remained a Funds Trustee as of the time of the Hearing.

*Zero's Motivations*

74. One of Zero's sworn interrogatory answers (P.Ex. 66) said that he was motivated to terminate plaintiffs because he believed they had a clear political agenda: to defeat Zero. In the Open Letter that Zero sent to Local 705 members he made it clear that he felt that votes by plaintiffs against his proposals are tantamount to a betrayal of the Union.

75. In his deposition Zero testified that he was motivated to "fire" plaintiffs because:

(a) they opposed his plan to create a Stewards' Council (Zero Dep. 15–17);

(b) while voting as members of the Executive Board in their capacity as officers, they succeeded in passing a resolution urging Zero to employ only full-time Union representatives (*id.* 25–26);

(c) he disagreed with the amount of money that plaintiffs, in establishing a budget as members of the Executive Board, had set aside for organizing activities (*id.* 40–41);

(d) during the April 14 Executive Board meeting, plaintiffs voted against Zero's proposal to hold joint elections for officers and delegates to the IBT convention (*id.* 36);

(e) also at the April 14 meeting, plaintiffs voted to remove one of the Trustees of the Funds, Otis Cross, and replace him with Greg Foster (*id.* 38–39); and

(f) at the same April 14 meeting plaintiffs continually raised the issue that Zero was spending too much money and was wasting the members' money (*id.* 38).

In sum, Zero himself really admitted—and this Court finds—that he was motivated to take the actions he did specifically to respond to and retaliate against positions that plaintiffs took *as officers* in opposition to his proposals.

76. This Court further finds that Zero was motivated to take those retaliatory actions in attempted retribution for the charges that plaintiffs have filed against

Zero. Although Zero denies that, that denial and his other statements lack credibility in light of the nature and timing of his retaliatory actions. In making this Finding this Court takes a number of matters into account, including:

(a) As described in more detail in prior and subsequent Findings, the heavy preponderance of the evidence presented to this Court compels the conclusion that the potentially legitimate reasons Zero has given for his actions are wholly pretextual. In no way do they justify the extreme actions that Zero has taken against plaintiffs or his deliberate delays in complying with this Court's TRO. In particular, Zero was unable to back up his extreme accusations of negligence against plaintiffs with any specifics.

(b) When Jackson told Zero that he was going to call the police to have his office opened, Zero said he would fabricate a claim that Jackson stole money from Zero's desk. Although Zero could have testified and denied that testimony by Jackson, he did not. Jackson relatedly testified that Union attorney Holland was a witness to the conversation. Although Holland was called as a witness by Zero, he too did not deny that Zero had made that statement. This Court credits Jackson's version, including his assertion that the threatened charge was totally false.

(c) On two occasions Zero said that he could not open an office or find plaintiffs' records because he did not know where the key was. In light of the immediately ensuing event that produced the key's location, that testimony by Zero must also be viewed as false and obstructionist in nature.

(d) Zero's letter to Local 705 members describing his discharge of plaintiffs shows him to be prone to the use of exaggerated and bombastic—and factually unsupported—language. For instance, Zero wrote that plaintiffs "worked to defeat proposals for a strong strike fund," even though it was plaintiffs who had proposed a $5 monthly strike fund assessment while Zero urged only a $2 monthly assessment. In addition Zero described plaintiffs as being "anti-member and pro-employer" and wrote that it was "particularly disgusting that they have chosen to undermine the members by adopting the rhetoric of management....," although those accusations were not backed up with anything substantive and, from the evidence at the Hearing, were also false.

### Zero's Purely Pretextual Claims

77. In purported support of Zero's adverse actions toward plaintiffs, he essentially contends that they had two separate jobs. According to Zero, each plaintiff held a job as a Local 705 officer and a separate distinguishable position as a Union representative or Business Agent. Because Bylaws give the principal executive officer (Zero) the power to terminate appointed Union employees, Zero claims he had the right to fire plaintiffs from their separate appointed positions and that he has in fact fired them only from those appointed positions, leaving their officer positions intact. That in turn, he says, authorizes him to direct the Union to pay each plaintiff a salary that Zero (in his sole discretion, and directly in the teeth of the Bylaws provision vesting that salary-setting power in the Executive Committee) feels is appropriate for an officer who performs only the duties explicitly described in the Bylaws, a salary he says should be about $15,000 per year.

78. Zero's claim that plaintiffs held Business Agent jobs separate and distinguishable from their elected positions as Union officers has no evidentiary support. Until this year there was no claim made by Zero or anyone else that plaintiffs had separate officer and Business Agent positions or that one portion of plaintiffs' salaries was for their work as Business Agents while another was for their work as Union officers. There are no documents *appointing* any plaintiff to a Business Agent posi-

tion, and by direct contrast each of them became an officer by being duly *elected,* thereafter carrying out as part of his duties the responsibilities that Zero now (entirely post hoc) seeks to label as Business Agent work. There are no documents distinguishing the amount of plaintiffs' salaries that was paid to them as officers from the amount that Zero now claims was paid to them as Business Agents. Neither any witness for Local 705 nor Zero himself ever described a time when Zero appointed the plaintiffs to be Business Agents or described a division between their officers' salaries and the salaries supposedly paid to them as Business Agents—or a corresponding division in functions.

79. Indeed, the objective evidence *from Zero himself* refutes his currently contrived position. Thus in December 1994, when Local 705 was emerging from trusteeship, Zero wrote to then IBT General President Carey about the salaries that would be paid *to officers* (P.Ex. 21, at 2):

> We expect the newly elected officers to retain one important area of change: lower salaries. . . . I have also decided to lower the salaries for the officers to be elected at Local 705 to $85,000 for Secretary–Treasurer, $80,000 for President, $70,000 for Recording Secretary and Vice President, $63,000 for Trustees, and $60,000 for the elected Business Agents. These are significant reductions in the salary levels which I hope will remain in place long after the trusteeship has ended.

There was no hint in that letter that the salaries that would be paid to officers were somehow a combination of two different salaries for two different jobs. Instead they were simply referred to as "the salaries for the officers."

80. By the same token, minutes of Executive Board meetings in 1996 and 1999

similarly record the approval of salary increases to Union *officers* (P.Ex. 5 at 5 and Ex. 8 at 4). Again there was no suggestion that the officers' salaries were paid to them in some dual capacity, or in any capacity other than as Union officers.

81. Local 705 also filed LM–2 forms with the Department of Labor. Those forms listed the salaries paid to officers on one page and the salaries paid to employees on another (P. Exs. 17 at 1; 18 at 8–10; 19 at 7–9 and 20 at 7–9). On those forms as well, the entire salary paid to each plaintiff was listed as a single total figure on the officers' page. Here too there was no suggestion on any of those forms that the salaries paid to plaintiffs were somehow divisible, with some portion being in fact paid to them as employees.

82. Moreover, any notion that each of McCormick, Benesch, Jackson and Pocztowski held two part-time jobs—a part-time job as a Union officer and a separate part-time job as a business representative—is wholly at odds with the representations made to Union members when the four plaintiffs ran for election. In the history of Local 705 before 1995, there had never been a Union officer who had not worked full-time for the Union. Then when plaintiffs and Zero campaigned to be elected in 1994, they put out campaign literature (P.Ex. 59 [6]) specifically stating that three Trustee candidates (Greg Galles, Steve Matter and Mike Thornton) were going to keep their jobs as truck drivers and work only part-time as Union Trustees. But at the same time, plaintiffs and Zero expressly represented themselves as candidates who were going to be full-time Union officers. As described by McCormick, plaintiffs then did work full-time as Union officers, and in the next election (in 1997) they again represented to the members that they would serve as full-time Union officers. Those represen-

---

**6.** In light of these detailed Findings and Conclusions, there is a special irony in the fact that the ticket on which Zero ran successfully with plaintiffs was called the "Reformers Pride Movement." Off of his performance recited here, "Reformers" such as Zero give that label a bad name.

tations are additionally inconsistent with Zero's presently manufactured claim that plaintiffs served as part-time Union officers and were paid separately as employees of Local 705, subject to discharge by Zero.

83. Even apart from that overwhelming evidence, it is extraordinarily unlikely that something so important could have existed and have gone completely unmentioned. Yet there exists no record of any discussion of such a separability concept at any level, by Zero or by anyone else.

84. It is of course true that Benesch, Jackson and Pocztowski represented Local 705 members employed by UPS with respect to their grievances in basically the same fashion that elected and appointed Business Agents of the Union do for its members. But the evidence shows that those plaintiffs took on those duties as an integral part of their total role as officers of Local 705, working to try to provide representation to its members at UPS with whom they were most familiar. Their taking on of work similar to that performed by Business Agents did not somehow transmute them into *appointed* Business Agents dischargeable by Zero, rather than their being elected officers with salaries set exclusively by the Executive Board.

85. Indeed, Zero's argument ·that the four plaintiffs held positions as Business Agents clearly collapses of its own weight when plaintiff McCormick is considered. There it is plain that McCormick performed a variety of duties as President that required his full-time work and that do not match up at all with the job of a Union Business Agent. Calling him a Business Agent does not make it so.

86. As if all those flaws were not enough to torpedo Zero's position (and they are), they are compounded by the excessiveness of Zero's actual conduct toward plaintiffs over the limited actions that would be appropriate solely to terminate plaintiffs as Business Agents (that is, if they actually held such positions as a divisible matter). Instead Zero took actions that made it impossible for plaintiffs to perform their duties *as officers* effectively: taking away their keys to the Local 705 offices, evicting them from their offices and desks, locking away the records and files that they needed and used to conduct Union business, cutting off their phone service, voice mail and pagers and telling Local 705 members that they had been "removed" and could not be trusted. When Zero wrote the letter to Union members (P.Ex. 3) describing his decision to remove plaintiffs, he did not describe any way for members to communicate with plaintiffs in the future. As already described, Zero's oppressive· actions did not serve (and they surely were not required for) any operational reason. Rather they were improperly designed to cut off effective contact between plaintiffs and Local 705's members. And even after Zero had been ordered *by this Court* to give plaintiffs access to books and records of the Union, he continued to act in a delaying and obstructive manner.

87. Finally, Zero's purely makeweight claim that he took action against plaintiffs because of their poor performance is not credible either. In his letter to Local 705 members purporting ·to justify his actions (P.Ex. 3), Zero asserted that plaintiffs had been negligent in "arriving unprepared at grievance hearings, telling members not to file grievances, and dumping their grievances on other staff members moments before Grievance Panel hearings."[7] Because Zero did not testify during the Hearing itself, this Court looks to his deposition and finds it totally wanting:[8]

---

7. If Local 705 members felt that they had been inadequately represented, one might reasonably have expected to see some unfair labor practice charge or other charges or complaints against Local 705 or plaintiffs as a consequence. There were none whatever.

8. At or after the conclusion of the Hearing Zero's.counsel submitted an offer of proof as to what Nightwine and Campbell had purportedly discovered and reported to Zero about the handling (or non-handling) of grievances at UPS during the period of plaintiffs'

(a) Zero testified that before he "fired" plaintiffs he never gave them anything in writing indicating there was anything unsatisfactory about their performance (Zero Dep. 63), nor did he ever give plaintiffs a list of grievances that were supposedly handled improperly. In fact, Zero didn't review grievances with plaintiffs and is not aware of anyone else doing that (*id.* 150).

(b) Zero further asserted that grievance forms were filed improperly, but he acknowledged never having asked plaintiffs any questions about grievance forms before they were fired (*id.*). As he testified (*id.* 165):

Q. Did you ever ask the plaintiffs about these grievance forms that don't have a resolution on them, why they don't have a resolution on them?

A. Have I asked them? Not me, no. Have they been asked? I don't know.

Q. You don't even know that?

A. I haven't asked them.

Q. And you don't know if anybody asked them?

A. I don't know.

(c) When Zero was asked how it could be that he decided on the same day in April that each of the four plaintiffs was performing inadequately, his flippant response was, "Just lucky, I guess. I don't really know. I mean what does that have to do with it?" (*id.* 144).

88. Although it may be "[t]o gild refined gold, to paint the lily,"[9] to expand on

Finding 87 by examining Zero's testimony in plaintiff-by-plaintiff terms, in every instance Zero was unable to recall any specifics to back up his bogus claim of poor performance:

(a) Zero has "no idea" if McCormick ever arrived unprepared for a grievance hearing (Zero Dep. 127) or if McCormick supposedly told members not to file grievances (*id.* 128). Nor does Zero know of any instances where McCormick supposedly dumped grievances on other staff members (*id.*).

(b) Zero testified this way as to Benesch (*id.* 143):

Q. Can you recall any times when you heard that Mr. Benesch supposedly told members not to file grievances?

A. Not to file grievances. No, I don't recall that.

Q. Can you recall any instances in which Mr. Benesch supposedly told—supposedly dumped grievances on other staff members moments before grievance panel hearings?

A. I don't recall that. I don't know. I wouldn't know, actually,—

Q. Okay.

A. —unless somebody told me that.

Though Zero falls back on a claim that he was told by Nightwine that Benesch supposedly arrived unprepared at grievance hearings, again he could not recall any specifics (*id.* 141–42). As he testified (*id.* 142–43):

responsibility for that activity, plus the proposed testimony of three individuals about some individual situations. Quite apart from any questions of credibility in the highly volatile, highly partisan climate of internecine union warfare, the relevant fact is of course what the decisionmaker—Zero—knew and remembered in terms of any information about plaintiffs' claimed malfeasance. Yet, despite every incentive for Zero to tar plaintiffs with that brush, and despite the recency of the events at issue (just a few months before Zero's deposition), this Finding reflects a total inability on Zero's part to identify any par-

ticulars (including *anything* about what Nightwine supposedly told him). Under the circumstances it is Zero's inability to substantiate plaintiffs' claimed inadequacies, rather than the attempted offers of proof, that controls. At the end, though, that is really a side issue that does not affect Zero's basic failure to justify his purported elected officer v. appointed Business Agent dichotomy and salary severability.

9. William Shakespeare, *King John* act IV, sc. 2.

Q. Can you recall any specifics of what Mr. Nightwine told you about Mr. Benesch supposedly being unprepared at grievance hearings?

A. I don't recall, no.

(c) Zero was also unable to name any specific instances when Jackson was supposedly unprepared to present grievances (*id.* 147):

Q. Do you know of any, you know, specific grievance that you claim Mr. Jackson was unprepared for?

A. Specific ones?

Q. Yes.

A. No, because I wasn't there. I just don't.

Even though Zero claimed that Jackson told Local 705 members not to file grievances, he could not provide any information as to when that supposedly occurred or as to the Union members involved (*id.* 149). Zero similarly testified that he didn't know of any specific instances when Jackson supposedly dumped grievances on other staff members: "I've heard that but I really don't know myself" (*id.* 152–53).

(d) Despite lengthy questioning, Zero could recall only one thing in purported support of his claim that Pocztowski has been unprepared for grievance hearings: Zero recalls being told that Pocztowski prepares his rebuttal arguments in advance (*id.* 135, 140). That of course hardly supports a claim that Pocztowski does not prepare. And Zero does not recall any instance when Pocztowski supposedly told Local 705 members not to file grievances or supposedly "dumped" a grievance on a staff member (*id.* 140).

### Conclusions of Law

This Court is of course keenly aware of the dim view that our Court of Appeals properly takes of any District Judge's slavish acceptance of any litigant's submission of proposed Findings and Conclusions—sometimes even to the point of repeating errors in spelling and typography (an almost certain indication that the District Judge has not given the required independent thought and consideration to the matter at hand)—see, e.g., *Andre v. Bendix Corp.*, 774 F.2d 786, 800 (7th Cir.1985) and cases cited there. As this Court always does in that respect, what has gone before reflects a paragraph by paragraph, sentence by sentence and word by word set of revisions of plaintiffs' proposed Findings (which were used as the starting point, both because plaintiffs are clearly entitled to prevail and because those proposed Findings were fundamentally sound).

In terms of what follows in the Conclusions, the situation is somewhat different for an important reason: After the litigants had made their respective submissions and responses to each others' submissions, the independent counsel for Local 705—who had been selected by agreement of the parties after this Court required that such independent representation be obtained because of conflict-of-interest considerations (see Finding 4)—tendered a Memorandum to the Court Filed by Independent Counsel for Local 705 ("Memorandum") that explained in careful detail the reasons that plaintiffs should prevail here. Because of the high quality of that work product coming from an independent source, a product that completely supports the analysis by this Court, a portion of that Memorandum is attached to these Findings and Conclusions and, as will be seen in the section captioned "Likelihood of Success on the Merits," is incorporated into these Conclusions. This kind of adoption is entirely consistent with the teaching of such cases as *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 23 (7th Cir.1992) (reconfirmed in *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1267 n. 4 (7th Cir.1995)), which approves such adoption of litigants' input "particularly if skillfully and wisely drafted."

1. This Court has jurisdiction over the subject matter of this action under 28

U.S.C. § 1331 and Act § 412. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

2. Local 705 is a "labor organization" as that term is used in Act § 402(i). Plaintiffs are members and elected officers of Local 705 as those terms are defined in Act §§ 402(o) and (n) respectively.

3. Both freedom of speech and freedom of assembly for all union members, including union officers, are protected by Act § 411(a)(2):

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

4. In interpreting that union "Bill of Rights," the Supreme Court has looked to whether the actions at issue will promote or hinder the democratic process within a union. Thus in 1982 *Finnegan* (see Finding 10(b)) held that a newly-elected executive officer of a union could discharge union *employees* to ensure support of his positions. But within less than a decade (see Finding 10(c)) *Lynn,* 488 U.S. at 355, 109 S.Ct. 639 (footnote and citations, including a citation to *Finnegan* as to the initial quotation omitted) made it clear that removing an *elected* union official for speech in opposition to a union leader is not like removing an *appointed* Business Agent:

The consequences of the removal of an elected official are much different. To begin with, when an elected official like Lynn is removed from his post, the union members are denied the representative of their choice. Indeed, Lynn's removal deprived the membership of his leadership, knowledge, and advice at a critical time for the Local. His removal, therefore, hardly was "an integral part of ensuring a union administration's responsiveness to the mandate of the union election."

Furthermore, the potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged. Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him. Seeing Lynn removed from his post just five days after he led the fight to defeat yet another dues increase proposal, other members of the Local may well have concluded that one challenged the union's hierarchy, if at all, at one's peril. This is precisely what Congress sought to prevent when it passed the LMRDA. "It recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal."

As all of the Findings and the further Conclusions make equally clear, it is the teaching of *Lynn* that controls here—the principle set out in *Finnegan* is wholly irrelevant.

■ 5. Those principles will be applied here by employing the yardstick set out in *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380 (7th Cir.1984). Although our Court of Appeals has spoken to the criteria governing the granting or denial on numerous occasions since then, in this Court's view those later decisions have never improved on the identification and explication of the factors a plaintiff must establish, which may be summarized thus:

(a) the absence of an adequate remedy at law;

(b) the irreparability of harm if injunctive relief is denied;

(c) some likelihood of success on the merits;

(d) the balancing of relative harms from the granting or denial of injunctive relief, utilizing a sliding scale dependent on the degree of likelihood of success on the merits; and

(e) the absence of disservice to the public interest.

### Inadequacy of Legal Relief and Irreparability of Harm

■ 6. Under the circumstances of this case, *Roland Machinery*'s first two factors can profitably be discussed together. Damages that might be awarded after the litigation is completed cannot and will not restore to plaintiffs their opportunity to serve the Local 705 membership, as they are required to do as union officers. Every day that plaintiffs are kept out of the Local 705 offices and are restricted from communicating with its members is a day that plaintiffs will be unable to protect the members' interests properly and that the members will correspondingly be denied the representatives of their choice. Local 705 is considering important issues, including its deteriorating financial position, settlement of its full-time jobs dispute with UPS and the organizational structure that should be used for representing members employed by UPS. Just as in *Lynn*, 488 U.S. at 355, 109 S.Ct. 639, if Zero's actions are not restrained they will "deprive[ ] the membership of [plaintiffs'] leadership, knowledge, and advice at a critical time for the Local."

7. Zero's unjustified restrictions on plaintiffs' contacts with Local 705 members also threatens, and is highly likely to cripple, plaintiffs in any attempt to run for reelection to office this November. Zero seeks to render plaintiffs nonentities in Local 705, removed from the Union's affairs, unseen and unheard of by the members. Incumbency has natural advantages in any election: By carrying out his duties

well and by serving members of the Union, an incumbent may demonstrate his knowledge of members' problems, activism, competence and energy on behalf of members and the necessary skill, judgment and determination in dealing with employers. At the same time that Zero has raised barriers to plaintiffs' contacts with the membership, he has unjustifiably sought to enhance his own role—attempting to communicate the false message that everything important at Local 705 is ascribable to Zero and Zero alone. As Local 705 through its independent counsel has admitted in its Answer, the opportunity of plaintiffs and of the members to elect their officers in a free and fair election will be irretrievably lost if Zero is not enjoined.

8. This case epitomizes the teaching in *Lynn* that retaliatory actions against elected union officials are likely to have a profound chilling effect on free speech, not just by the elected officials but by other union members as well. In that respect the situation parallels what was said as to the constitutional guaranty of free speech in *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976):

> The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.

Accord, equating any deprivation of freedom of expression rights with irreparable harm and inadequacy of remedy at law, *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir.1990).

9. Relatedly, as this Court found in issuing the TRO, this is not a case in which an employee is discharged and can seek to cover his losses by finding employment elsewhere. Zero himself has insisted that plaintiffs are duty-bound to continue to fulfill their duties as officers of Local 705, and it would be impossible for them to take full-time work elsewhere while carrying out their duties as Union officers. And to tie into the earlier Conclusions, if plaintiffs were required to take jobs elsewhere

to make up for their lost salaries, they would have to give up much of their contact with and service to Local 705 members, suffering loss of reputation with the members as a result and being severely disadvantaged in campaigning for Union office.

*Likelihood of Success on the Merits*

■ 10. Although the *Roland Machinery* standard is framed only in terms of "some likelihood of succeeding on the merits" (749 F.2d at 387), described as a mere showing that "the plaintiff's chances are better than negligible" (*id.*), here plaintiffs' merits showing is overwhelming. All of the Findings are strongly supportive of plaintiffs' position and are so adverse to the lame contentions advanced by Zero as to be devastating to his position. Zero's contentions are entirely pretextual, and his conduct has plainly violated plaintiffs' rights under Act § 411(a)(2) as further explicated in *Lynn*. Although no further elaboration is really required, this Court also explicitly approves and adopts the legal analysis well set out at pages 8–14 of the Memorandum filed by Local 705's independent counsel.

■ 11. Nor is plaintiffs' likelihood of success on the merits diminished by Zero's unpersuasive contention that plaintiffs have failed to exhaust internal union remedies. That requirement is one committed to the sound discretion of the court (see, e.g., the still definitive seminal decision in *N.L.R.B. v. Industrial Union of Marine and Shipbuilding Workers of Am.*, 391 U.S. 418, 425–26, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968)), and where as here the violation involved is an impairment of free speech rights (necessarily implicating irreparable harm) such exhaustion is not called for (see, e.g., such cases as *Keeffe*

*Bros. v. Teamsters Local Union No. 592*, 562 F.2d 298, 302–03 (4th Cir.1977) and cases cited there). That is particularly true where, as here, both (a) the past experience regarding charges brought against Zero (involving the IBT's extended delays both in conducting a hearing and, since then, in obtaining a decision that has not yet been forthcoming) and (b) the IBT's current extended failure to set a hearing on the most recent charges dealt with here strongly contraindicate any need for such exhaustion.[10]

■ 12. Though this is not a matter of exhaustion of internal union remedies in the same sense, this Court also rejects Zero's contention that it is necessary to seek the IBT's construction of its Const. Art. XXII, § 3(d)(see Finding 29). That provision is unambiguous, and it has been flatly violated by Zero—and the just-stated Conclusions are not placed into question by the answer that was provided by IBT General President Hoffa (P.Ex. 44) to a request from Local 705's in-house attorney Holland, which addressed a factual situation that is entirely at odds with the Findings here.

■ 13. In terms of the *Roland Machinery*, 749 F.2d at 387 concept of the "sliding scale" ("The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor"), this Court has stated in issuing the TRO, and it now reconfirms, that it perceives no harm to Local 705 if plaintiffs (who are its elected officers and a majority of its Executive Board) are permitted to function as they have in the past, rather than being subjected to the arbitrary and vindictive constraints imposed by Zero.[11] And as to Zero himself, he

---

10. Plaintiffs have also submitted evidence casting doubt on their ability to get a fair hearing because of partiality toward Zero at the higher levels of the IBT. Though that further argument appears to have force, this Court need not rely on such further reasons to support an already well-founded Conclusion.

11. Local 705 will of course sustain a financial impact from the restoration of plaintiffs' salaries. But Local 705, through its independent counsel, has confirmed that it is in the best interests of the Union to restore plaintiffs' salaries. After all, the Local 705 members re-elected plaintiffs as officers fully aware that

cannot conceivably suffer any legally cognizable harm through issuance of a preliminary injunction so that plaintiffs can continue to function in the positions to which they were elected.

### Public Interest

14. *Roland Machinery,* 749 F.2d at 388 sensibly clarified the concept, articulated in earlier cases, of preliminary injunctive relief not disserving the public interest by reframing the inquiry in terms of how the grant or denial of such relief may affect the interests of people who are not parties to the proceedings before the court. In this instance the obvious relevant "public" whose interests may be affected are the members of Local 705, and in those terms the public interest also plainly favors issuance of a preliminary injunction. Zero's actions have effectively deprived Local 705's members of full access to their officers, just as plaintiff officers have been deprived of full access to their constituency, the Local 705 membership.

\*   \*   \*   \*   \*   \*

For the reasons stated in the foregoing Findings and Conclusions, Gerald Zero, Local 705 and their respective agents and employees are hereby ordered until further order of this Court:

1. to continue to pay to each of the four plaintiffs the full salary that he was being paid as of April 1, 2000;

2. to provide plaintiffs with full access, without interference, to the books and records, and to the bookkeepers and all other members of the staff, of Local 705;

3. to give plaintiffs John McCormick ("McCormick"), Ed Benesch ("Benesch") and Steve Pocztowski ("Pocztowski") the same full access they had as of April 1, 2000 and give to plaintiff Bennie Jackson ("Jackson") the same full access he had as of March 1, 2000, again without interference, (a) to their offices (or in the case of Pocztowski, to his desk and cubicle), (b) to the files, records and papers they kept in their offices or cubicle, as the case may be, (c) to the Local 705 phone system, phone mail system and pagers and (d) to all other equipment and facilities that plaintiffs have used in the past at Local 705;

4. expressly to direct all employers that are subject to collective bargaining agreements with Local 705 to provide plaintiffs with the same access to their facilities and employees that plaintiffs had as of April 1, 2000;

5. expressly to advise UPS management in particular that plaintiffs are designated by Local 705 to act as representatives of Local 705 members;

6. to inform McCormick of the time and place of any negotiating sessions, negotiating committee meetings or bargaining sessions with UPS and to invite and allow him to be present at any such meetings or sessions;

7. to provide McCormick in a timely manner with copies of all correspondence, grievances and other communications involving UPS or members of Local 705 who work at UPS;

8. to direct all Local 705 union representatives who are assigned to cover UPS employees to report on their activities to McCormick;

9. to inform McCormick in a timely fashion of the hiring or firing of any Local 705 employees or stewards who represent UPS employees; and

10. to restore all plaintiffs to the responsibilities and duties they carried out in representing UPS employees as of April 1, 2000, including:

    (a) designating Benesch as the person with lead responsibility for representing UPS employees and directing the activities of Local 705 stewards at

they were paid full-time salaries and fully expecting them to continue to work full time for the Union, as they had done in the past.

Fulfillment of that justifiable quid pro quo expectation cannot fairly be characterized as "harm" to Local 705.

the UPS facilities in Northbrook, Palatine and Gurnee;

(b) designating Jackson as the person with lead responsibility for representing UPS employees and directing the activities of Local 705 stewards at the UPS Jefferson and Dobson facilities and the Chicago "air walkers"; and

(c) designating Pocztowski as the person with lead responsibility for representing UPS employees and directing the activities of Local 705 stewards at the UPS facilities in Addison, Franklin Park and O'Hare Airport.

Because there appears to be no prospect that any additional evidence would call for any different findings or conclusions as the basis for entering and establishing the terms of a *permanent* injunction, this action is set for a next status hearing at 9:30 a.m. August 28, 2000 to discuss that subject and the possible entry of a final order in this action (as well as to discuss the subject referred to in n. 5).